In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-12-00098-CV
IN THE INTEREST OF S.J.T.B.

**On Appeal from the County Court at Law**
**Polk County, Texas**
**Trial Cause No. PC04927**

## MEMORANDUM OPINION

Don and Stephanie,[1] S.J.T.B.'s paternal uncle and aunt, ("petitioners") filed a petition seeking custody of S.J.T.B., in which the Texas Department of Family and Protective Services (the "Department") became involved and in which Joseph and Kimberly, S.J.T.B.'s maternal grandparents, ("intervenors") filed a petition in intervention. A jury found, by clear and convincing evidence, that the parental rights of Daniealle and Leslie (the "parents") should be terminated, the Department should be named sole managing conservator, and no possessory conservator should be named. In three appellate issues, the parents challenge the admission of certain evidence, the legal

---

[1]For the sake of clarity, the parties and other principals will be referred to in the following manner: petitioners – Don and Stephanie; intervenors – Joseph and Kimberly; mother of the child – Daniealle; father of the child – Leslie.

1

and factual sufficiency of the evidence to support termination, and the effectiveness of their trial attorneys. In four appellate issues, petitioners challenge the sufficiency of the evidence to support the jury's conservatorship findings.[2] We affirm the trial court's judgment.

## Factual Background

Investigator Lou Liles testified that, in 2003, the Department investigated allegations of sexual abuse by Leslie and removed Leslie's three children. Liles testified that two of the children were seen hiding food. A home study of Stephanie's home was approved and the children were temporarily placed with her. The Department was unable to determine that the alleged sexual abuse occurred, but reported the information to law enforcement. Leslie relinquished his parental rights to the three children.

In 2008, the Department investigated allegations of neglectful supervision by Daniealle, based on claims of mental health, instability, and drug abuse, regarding Daniealle's two daughters. The Department found neglectful supervision and placed the two children with intervenors, Daniealle relinquished her parental rights, and intervenors adopted the children.

In 2010, the Department investigated allegations that Daniealle dropped S.J.T.B. and burned S.J.T.B. with a cigarette, but the Department determined that these were accidents. Liles testified that the Department also investigated allegations of neglectful

---

[2]Intervenors did not appeal from the trial court's judgment.

supervision, but closed its investigation once the trial court became involved. Daniealle and Stephanie subsequently engaged in a verbal and physical altercation in S.J.T.B.'s presence. The Department reopened its investigation because of allegations that S.J.T.B. was injured during the altercation, but Liles testified that S.J.T.B. was not injured, and the Department was unable to determine that neglectful supervision occurred. Liles testified that the Department was concerned by the fact that S.J.T.B. was present during the altercation.

Caseworker Jill Dunaway testified that, after petitioners filed suit, S.J.T.B. was placed with petitioners via a court order and that petitioners were pleasant, concerned about S.J.T.B., and interested in taking steps to keep S.J.T.B. Dunaway testified that communications with petitioners soured when the Department placed S.J.T.B. in foster care after learning that petitioners had allowed the parents to live in their home. When the Department later returned S.J.T.B. to petitioners, communications improved unless the parents or petitioners disapproved of something Dunaway said or did.

Dunaway testified that the parents and petitioners have a tense relationship. She testified that the parents originally wanted S.J.T.B. to be placed in foster care rather than with petitioners. She testified that the parents feared petitioners wanted permanent custody of S.J.T.B. and did not want him returned to his parents. Dunaway testified that the parents and petitioners accused each other of using drugs. Daniealle admitted making a statement, albeit out of anger, that Stephanie would never have S.J.T.B. Despite their

disagreements, Daniealle testified that petitioners have been there whenever she or S.J.T.B. needed anything and that she has petitioners' love, support, and help. Stephanie testified that she and Daniealle have reconciled.

Daniealle testified that petitioners have been S.J.T.B.'s primary caretakers because she and Leslie could not provide for S.J.T.B. According to Daniealle, she and Leslie have lived in different locations and were often unemployed. Leslie receives social security. Daniealle testified that they move frequently because they have a fixed income. Dunaway testified that Leslie said he cannot work because he has a heart problem and a pacemaker. Daniealle explained that she struggles to hold a job because she often becomes angry and quits. At the time of trial, the parents lived in a mobile home, but Daniealle explained that they are frequently on the road operating their business.

Daniealle admitted that there are at least two warrants out for her arrest and that she has been hospitalized for mental health issues, diagnosed with bipolar disorder, and prescribed medication. Daniealle also admitted abusing illegal and prescription drugs, using drugs with Leslie, and receiving drugs from Leslie. Daniealle denied ever being so intoxicated that she could not care for herself or S.J.T.B. and she denied using drugs around S.J.T.B. She testified that she no longer has a problem with prescription drugs and that her bipolar medication is currently regulated.

Regarding the parents' relationship, Stephanie testified that Leslie is controlling and treats Daniealle "like a dog[.]" Counselor Stephanie Miller testified that Daniealle

4

accused Leslie of being verbally abusive and controlling. Daniealle testified that she once left Leslie because they were not "getting along[,]" but that she returned to Leslie after he filed a petition seeking custody of S.J.T.B. During the termination proceedings, Daniealle again left Leslie and began living with intervenors. Miller testified that Daniealle appeared to be doing better, had a job, had an elevated mood, and looked healthier. Dunaway testified that Daniealle worked, helped with the children, and seemed to be doing well. Joseph, Daniealle's father, testified that Leslie visited Daniealle, which caused "trauma and drama" because Daniealle wanted nothing to do with Leslie, Daniealle and Leslie argued, and Joseph had to leave work to calm the situation. Daniealle testified that Leslie made excessive telephone calls and accused Daniealle of stealing some of his prescription medication. Dunaway testified that Daniealle eventually returned to Leslie, telling Dunaway that she wanted to make the relationship work and she was doing what was best for her. Daniealle testified that she left intervenors' home because she partied too much and Leslie's family treated her better. Miller testified that Daniealle appeared to backslide when she returned to Leslie. Given the 2003 allegations against Leslie, Daniealle testified she is unsure about their future together.

Dunaway opined that S.J.T.B. is in danger in his parents' home. She explained that the parents failed to demonstrate the changes in behavior desired by the Department, were never stable, and did not do what was needed to regain custody of S.J.T.B.

5

Daniealle admitted that she cannot currently care for S.J.T.B., but she explained that she always sought help by taking her children to people who could care for them.

Dunaway, however, testified that the parents endangered S.J.T.B. by placing him with petitioners because petitioners have a history with the Department. Liles testified that, in 2004, the Department reached a "reason to believe" disposition regarding allegations of neglectful supervision by Stephanie. In 2006 and 2009, the Department ruled out allegations of physical abuse of Stephanie's teenage daughter D.H. Regarding the 2009 incident, Stephanie explained that D.H. failed to come home on time, that she had difficulty locating D.H. and contacted officers, that D.H. became angry when found and pushed Stephanie so hard that Stephanie fell, and that Stephanie spanked D.H. with a leather belt. Linda McCarty, Stephanie's former mother-in-law, testified that D.H. was injured, went to a SAAFE house, and sought a protective order against Stephanie. Liles testified that Stephanie's decision to spank D.H. was inappropriate discipline, but not physical abuse.

Additionally, Daniealle testified to an instance when Stephanie lost her temper with her step-daughter, which upset S.J.T.B. and required Daniealle to remove S.J.T.B. from the room. Don testified to an instance when another vehicle struck his vehicle and the other driver threatened Stephanie, which prompted Don to kick in the other driver's vehicle door. D.R. testified that he felt remorseful and bought the other driver a new vehicle door. McCarty testified that she was not allowed to see her grandchildren if

Stephanie was angry with McCarty and that she is not allowed much contact with her youngest granddaughter.

Miller and conservatorship supervisor Amanda Jackson recommended termination of the parents' rights. Miller explained that there is dysfunction, violence, and drug abuse in the parents' home and that, because past behavior is the best predictor of future behavior, it is not realistic to believe that significant change will occur. Joseph believed the parents' rights should be terminated because they cannot financially, physically, or mentally care for S.J.T.B.

Daniealle testified that she has a good relationship with S.J.T.B. and that termination would adversely affect S.J.T.B. Daniealle wanted S.J.T.B. to be placed with petitioners. She believed petitioners would provide for S.J.T.B.'s safety, emotional needs, physical needs, medical care, and stability. She knew of no reason why petitioners' residence would be inappropriate for S.J.T.B., saw no inability of petitioners to care for S.J.T.B., and testified that petitioners have spent their own money to care for S.J.T.B. Daniealle testified that S.J.T.B. has spent nearly his entire life with petitioners, is comfortable, happy, and loves petitioners, and that petitioners love, provide for, and play with S.J.T.B., provide a safe environment for S.J.T.B., and include the parents in S.J.T.B.'s life. Daniealle anticipated having more visitation if S.J.T.B. was placed with petitioners, and she believed petitioners would be accommodating should she someday be able to care for S.J.T.B. She testified that if S.J.T.B. would be happy and safe and could

7

be with petitioners, she would even cease contact with him if so directed. Daniealle concluded that S.J.T.B. wants to be with petitioners and would be happiest with petitioners.

Stephanie testified that Daniealle and S.J.T.B. have a "unique bond[,]" S.J.T.B. loves his parents, and termination would negatively affect S.J.T.B. Stephanie believed that, with help, the parents could be joint managing conservators, but she did not believe they could take care of him. She and Don believed that S.J.T.B. should be placed with their family. Don testified that he loves S.J.T.B. like a son, he enjoys being with S.J.T.B., and S.J.T.B. is cared for, provided for, and happy. Stephanie testified that she treats S.J.T.B. like her own child, her family loves S.J.T.B., she takes S.J.T.B. to the doctor, tucks him in at night, comforts him, and provides for him, S.J.T.B. and Don are "best friends," and S.J.T.B. participates in family activities. She testified that S.J.T.B. is happy and that her home is the only one he has ever known. Don testified that he and Stephanie sought treatment for S.J.T.B.'s hearing problems and that, after three surgeries and speech therapy, S.J.T.B. is doing well. Stephanie testified that she never sought financial help with S.J.T.B. and did not need monetary support. Don testified that he is willing to care for S.J.T.B. indefinitely, and that his home is the safest place for S.J.T.B. Petitioners testified that they would keep the parents away from S.J.T.B. if so directed. Stephanie testified that it would be devastating if S.J.T.B. was not placed with her family.

8

Petitioners' friends believed that petitioners were an appropriate placement for S.J.T.B., and they could identify no reasons why petitioners should not have custody of S.J.T.B. or would not be good parents. Darrell Longino testified that Don is a good father and that Stephanie appropriately handled the situation with D.H. Carey Cochran testified that S.J.T.B. is content, cared for, neat, and clean. Dr. Joseph Goin testified that he has treated Stephanie's children and that petitioners brought S.J.T.B. for regular checkups.

Dunaway testified the Department never approved petitioners as a placement. Jackson testified that, because of petitioners' history with the Department, the Department did not conduct a home study, a home study would not have been approved, and the Department did not recommend placement with petitioners. She explained that S.J.T.B. is at a greater risk of harm in petitioners' home. She testified that if the jury placed S.J.T.B. with petitioners, petitioners would not qualify for any assistance from the Department because of their history. Dunaway did not believe S.J.T.B. was currently in danger in petitioners' home, but she perceived a risk of endangerment because of petitioners' history and she did not believe that a child should be placed in a home with people who have such a history.

Dunaway believed that petitioners love S.J.T.B. and would provide for him, but she was concerned with the lack of discipline and boundaries in petitioners' home. She explained that she saw no corrective measures taken when S.J.T.B. pushed the rules or

9

boundaries. Patricia Eeds, S.J.T.B.'s guardian ad litem, believed petitioners love S.J.T.B., but she expressed concern that Leslie would have too much access to S.J.T.B. if he were placed with petitioners, even if Leslie's rights were terminated. Miller testified that if S.J.T.B. is placed with petitioners and his parents are allowed to come in and out of his life, he "will never have a day's peace[]" because there will always be chaos and fighting. Miller believed that limiting the parents' contact with S.J.T.B. would be challenging for petitioners. Liles testified that the Department seemed to always be receiving calls and conducting investigations and that the parents and petitioners were an unending source of chaos. Jackson explained that the better option for the child, in terms of best interest, is the "more peaceful environment[.]"

Based on an approved home study of intervenors' home and the fact that S.J.T.B.'s two sisters reside with intervenors, Jackson recommended appointment of the Department as sole managing conservator, no appointment of a possessory conservator, and eventual placement with intervenors. Miller agreed that S.J.T.B. should be placed with intervenors. She explained that S.J.T.B. needs long-term stability, an environment free from drugs and family violence and, if possible, to grow up with his siblings.

According to Dunaway, Daniealle once supported intervenors as a potential placement, but changed her mind when she returned to Leslie. Daniealle explained that this change of heart was caused by a feeling that love is not the reason intervenors want S.J.T.B. Daniealle testified that she does not want intervenors to raise S.J.T.B. Daniealle

10

explained that during her childhood, Joseph did not know how to raise her, slapped her, yelled at her, and disciplined her with a belt when she slit her wrists. Daniealle testified that she and Joseph have never had a good relationship, that she does not have a good relationship with Kimberly, and that intervenors have often held her two daughters over her head.

The record indicates that Joseph is also not close to his other children, except for one, and that his other children, like Daniealle, have struggled with drug use. He admitted that he previously banned Daniealle from his home and that he does not allow her to see her daughters when she is using drugs. Joseph testified that he loves Daniealle and has never given up on her. Miller testified that during her counseling sessions with Joseph, he expressed a desire to have more contact with Daniealle and he expressed concern that Leslie's family was inhibiting contact. Daniealle testified that Leslie's family encouraged her to mend her relationship with Joseph. Nevertheless, Daniealle testified that she did not want S.J.T.B. to have the same experiences that she had.

Dunaway testified that intervenors had court-ordered visitation, but that petitioners and intervenors lodged complaints against each other when conducting exchanges. Dunaway testified that petitioners tended to delay the exchanges and that Stephanie cried, which upset S.J.T.B. Both parties complained about the other delivering S.J.T.B. with a physical ailment, such as a cold, diaper rash, or a boil. Joseph testified that petitioners refused to provide them with S.J.T.B.'s Medicaid card. Don testified that intervenors

11

made false complaints against petitioners. Stephanie testified that she began carrying a recorder for her family's protection. Daniealle testified that intervenors helped her prepare an email to their attorney, but manipulated the email to reflect poorly on petitioners.

Joseph admitted that S.J.T.B. initially cried when he left petitioners, but he testified that exchanges became easier and that S.J.T.B. played once he arrived at intervenors' home. Stephanie testified that S.J.T.B. is still scared and asks to go home. Daniealle testified that S.J.T.B. appears cared for by intervenors, but she testified that S.J.T.B. was not happy with intervenors. Don testified that S.J.T.B. is not happy with intervenors and is in danger in intervenors' home. He claimed that Joseph associated with a known drug dealer and did nothing when Daniealle told Joseph she had been sexually abused by her uncle. Dunaway testified that S.J.T.B. seemed happy with intervenors, played, and had fun with intervenors and his sisters. She saw no indication that S.J.T.B. was unhappy with intervenors. Dunaway testified that S.J.T.B. is not in physical or emotional danger in intervenors' home. Miller testified that the environment in intervenors' home appears consistent, calm, and healthy. Eeds testified that the environment seemed happy and S.J.T.B.'s sisters are loving and happy.

Petitioners testified they could cooperate with intervenors if S.J.T.B. was placed with their family and intervenors received visitation rights. Joseph wanted S.J.T.B. to have a relationship with petitioners, but he believed that it would be difficult for him to

12

visit S.J.T.B. without a court order. Jackson testified it would be unhealthy for petitioners and intervenors to be named joint managing conservators, given that the two families have not demonstrated an ability to get along. She testified that, if S.J.T.B. was placed with intervenors, she would encourage intervenors to allow petitioners to have a relationship with S.J.T.B., provided there is no negative impact on S.J.T.B.

Legal and Factual Sufficiency

In issue two, the parents contend the evidence is legally and factually insufficient to support the termination of their parental rights. In issues one through four, petitioners contend that the evidence is legally and factually insufficient to support the jury's findings regarding conservatorship.

We first address the parents' sufficiency challenge. To challenge the factual sufficiency of the evidence, the appealing party must have first asserted the point in a motion for new trial. Tex. R. Civ. P. 324(b)(2); *In the Interest of M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). To preserve a legal sufficiency challenge for appeal, the appealing party must have asserted the point by (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510-11 (Tex. 1991).

Although the record contains Leslie's motion for new trial raising sufficiency challenges, the record does not indicate that Daniealle filed a proper motion or lodged a

proper objection raising her sufficiency challenges. *See* Tex. R. Civ. P. 324(b)(2); *see also M.S.*, 115 S.W.3d at 547; *Cecil*, 804 S.W.2d at 510-11. Appointed counsel's unexcused failure to preserve a valid sufficiency point for appeal may constitute ineffective assistance of counsel in a termination case. *In the Interest of C.T.*, No. 09-11-00694-CV, 2012 Tex. App. LEXIS 2485, at *3 (Tex. App.—Beaumont Mar. 29, 2012, no pet.) (mem. op.) (addressing sufficiency issues in a termination case when issues were not preserved and no ineffective assistance claim was raised). Daniealle does not argue ineffective assistance of counsel on this basis and counsel is not automatically ineffective for failing to preserve the issues. *See id.* If counsel could have reasonably believed the evidence to be sufficient, counsel's performance does not fall below an objective standard of reasonableness merely because the verdict was not challenged. *Id.*

Under legal sufficiency review, we review all the evidence in the light most favorable to the finding to determine whether "a factfinder could reasonably form a firm belief or conviction about the truth" of the allegations. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id.*

14

Under factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *Id.* We give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient." *Id.*

In this case, the jury could terminate the parents' rights if it found that they: (1) knowingly placed or knowingly allowed S.J.T.B. to remain in conditions or surroundings which endanger his physical or emotional well-being; or (2) engaged in conduct or knowingly placed S.J.T.B. with persons who engaged in conduct which endangers his physical or emotional well-being. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E) (West Supp. 2012). Under section 161.001(1)(D), a parent's conduct in the home can create an environment that endangers the child's physical and emotional well-being. *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent." *In the Interest of M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Regarding S.J.T.B.'s best interest, we

consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts/omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts/omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code. Ann. § 263.307(b) (West 2008).

The jury heard testimony that both parents have a history of substance abuse, there are warrants out for Daniealle's arrest, and both parents have a history with the Department which resulted in the removal of their children. The record contains evidence that the parents have been unable to care for S.J.T.B. and were unable to care for S.J.T.B. at the time of trial. The jury also heard evidence that the parents have a tumultuous relationship. Although Daniealle testified that she was unsure of the relationship's future, the jury also heard evidence that Daniealle has returned to the relationship on more than one occasion and even left a situation in which she had begun to improve to pursue her relationship with Leslie because she believed it to be in her best interest. The jury heard Miller's testimony that Daniealle subsequently appeared to regress, that a relationship between Daniealle and Leslie will always be unhealthy, and

16

that it is unrealistic to believe that significant change will occur because past behavior is the best predictor of future behavior.

The jury heard evidence that S.J.T.B.'s parents have an unstable home and inconsistent employment, and that S.J.T.B. is in danger in their home. Miller, Liles, and Jackson testified to the chaos that S.J.T.B.'s parents have caused in his life and explained his need for a peaceful and stable environment. Given the dysfunctional and abusive atmosphere of the parents' home, the parents' instability, and the parents' inability to provide for S.J.T.B., several witnesses testified in favor of termination.

Other witnesses testified against termination. The jury heard testimony that S.J.T.B. and his parents love each other and that termination would negatively impact S.J.T.B. Stephanie testified that the parents could care for S.J.T.B. if they had help. The jury also heard Daniealle's testimony that prescription drugs no longer pose a problem for her, she never suffered from intoxication that prevented her from being able to care for herself or S.J.T.B., she never used drugs around S.J.T.B., and her medication is regulated. She explained that she left intervenors' home, not because of Leslie, but because she needed the support of Leslie's family. S.J.T.B. was too young to express his desires at trial. The record contains evidence that the parents and S.J.T.B. have a good relationship, but also contains evidence that a continued relationship would not be in S.J.T.B.'s best interest.

The jury could reasonably conclude that the conduct of Daniealle and Leslie created an environment that endangers S.J.T.B.'s physical and emotional well-being and could infer from this past endangering conduct that similar conduct would recur if S.J.T.B. were returned to his parents. *See M.R.J.M.*, 280 S.W.3d at 502; *see also J.T.G.*, 121 S.W.3d at 125. The jury could reasonably have formed a firm belief or conviction that Daniealle and Leslie knowingly placed or knowingly allowed S.J.T.B. to remain in conditions or surroundings which endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *see also In the Interest of C.A.C.*, No. 09-10-00477-CV, 2011 Tex. App. LEXIS 3385, at *2 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.) (A judgment will be affirmed if any one of the grounds is legally and factually sufficient and the best interest finding is also legally and factually sufficient.).

Additionally, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). The jury could reasonably conclude that Daniealle and Leslie were unable to provide a safe environment for S.J.T.B. The jury could reasonably have formed a firm belief or conviction that termination of Daniealle's and Leslie's parental rights was in S.J.T.B.'s best interest. *See id*. §§ 161.001(2), 263.307(b); *see also J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the Department established, by clear and convincing evidence, that Daniealle and Leslie committed the predicate act

18

enumerated in section 161.001(1)(D) and that termination is in S.J.T.B.'s best interest. *See* Tex. Fam. Code Ann. § 161.001. We overrule the parents' second issue.

We next address petitioners' sufficiency issues.[3] Conservatorship is governed by a preponderance-of-the-evidence standard and is reviewed under ordinary sufficiency standards. *In the Interest of J.A.J.*, 243 S.W.3d 611, 616, 617 n.5 (Tex. 2007). The legal sufficiency standard requires us to consider "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the verdict, credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Del Lago Ptnrs. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010). The factual sufficiency standard requires us to consider and weigh all of the evidence, and we may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

---

[3]In their brief, petitioners mention that the Department failed to meet its burden of proof to support removal of S.J.T.B. from petitioners. *See* Tex. Fam. Code Ann. § 262.205 (West 2008) (When the child is not in the possession of a governmental entity, under certain circumstances, the trial court may remove the child from the caretaker after an adversarial hearing.). The Department contends that this argument is not preserved and should be brought via a petition for writ of mandamus. We construe petitioners' appeal as challenging the jury's findings regarding conservatorship, which the trial court incorporated into its order of termination.

19

As previously stated, S.J.T.B. was not old enough to express his desires at trial. The jury heard Daniealle's opinion that S.J.T.B. was not happy with intervenors, but wants to be with petitioners and would be happiest with petitioners. The record also contains evidence that S.J.T.B. loves petitioners, is happy with petitioners, has bonded with Don in particular, and participates in family activities with petitioners. The jury heard evidence that petitioners brought S.J.T.B. for regular medical checkups and sought successful treatment for S.J.T.B.'s hearing problem. Daniealle and Stephanie testified that petitioners could meet S.J.T.B.'s emotional, physical, and financial needs.

Petitioners' friends testified that petitioners are good parents and take care of S.J.T.B. Dunaway testified that petitioners love and provide for S.J.T.B. and she did not believe that S.J.T.B was currently in danger in petitioners' home. Daniealle did not believe that a parent-child relationship between S.J.T.B. and petitioners would be inappropriate. Don testified he is prepared to care for S.J.T.B. and keep him safe, which includes keeping the parents away from S.J.T.B. if so directed. The jury heard testimony that S.J.T.B. has spent a significant portion of his life with petitioners and that petitioners love S.J.T.B. like a son. The record also demonstrates that Stephanie's home previously passed a home study in an unrelated case.

The jury also heard evidence of the discord between the parents and petitioners, including allegations of drug abuse against each other, the altercation between Stephanie and Daniealle that occurred in S.J.T.B.'s presence, and the parents' concerns that

20

petitioners wanted S.J.T.B. and did not want him returned to his parents. The record contains evidence of petitioners' history with the Department, which Dunaway opined created a risk of endangerment to S.J.T.B. The jury also heard testimony of petitioners' conflicts with other individuals. Witnesses expressed concern regarding a lack of discipline and boundaries in petitioners' home, the parents' potential access to S.J.T.B. if he were placed with petitioners, and the chaos that the relationship between the parents and petitioners has caused to S.J.T.B.

Miller and Jackson testified that the better option for S.J.T.B. is an environment with stability and peace. Witnesses testified that petitioners had never been approved as a placement and that, because of petitioners' history, the Department would not have approved a home study, the Department did not recommend placement with petitioners, and petitioners would not qualify for any assistance from the Department.

As the sole judge of the weight and credibility of the evidence, the jury was entitled to resolve any conflicts in the evidence and choose which testimony to believe. *See City of Keller*, 168 S.W.3d at 819; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). In doing so, the jury could reasonably conclude that naming the Department as sole managing conservator and not naming petitioners as possessory conservators was in the best interest of S.J.T.B. *See Del Lago Ptnrs.*, 307 S.W.3d at 770; *see also City of Keller*, 168 S.W.3d at 822, 827. The evidence supporting the verdict is not so weak, nor so against the great weight and preponderance of the

21

evidence, as to render the jury's findings clearly wrong and unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. Because the evidence is legally and factually sufficient to support the jury's conservatorship findings, we overrule petitioners' four appellate issues.

Evidentiary Issues

In issue one, the parents contend that the trial court abused its discretion by admitting a copy of the Department's original petition into evidence because that exhibit contained a copy of Liles's affidavit and a copy of the trial court's previous emergency order for protection. Leslie also challenges admission of Liles's testimony regarding his former history with the Department, *i.e.*, allegations of sexual abuse. We review a trial court's evidentiary rulings for abuse of discretion. *In the Interest of J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

When the exhibit was admitted into evidence, Daniealle's counsel and Leslie's counsel both stated, "No objections." To preserve error, the complaining party must have timely objected and obtained a ruling on the objection. Tex. R. App. P. 33.1(a). When a party affirmatively asserts that he or she has "no objection" to the admission of complained-of evidence, any error in the admission of the evidence is waived. *Tex. Dep't of Transp. v. Pate*, 170 S.W.3d 840, 850 (Tex. App.—Texarkana 2005, pet. denied). Having affirmatively stated that they had no objection to admission of the exhibit into evidence, the parents have failed to preserve their complaint regarding admission of Liles's affidavit. *See id.*; *see also* Tex. R. App. P. 33.1(a). Likewise, the record indicates

22

that Leslie did not object to the portions of Liles's testimony of which he now complains on appeal. His complaint is not preserved for our review. *See* Tex. R. App. P. 33.1(a).

The parents were not required to object to admission of the trial court's order to preserve their complaint that admission of the order amounts to impermissible testimony by the trial court.[4] *See* Tex. R. Evid. 605. The presiding trial judge may not testify in the trial as a witness. *Id*. Admission of an order which contains findings based upon pretrial evidence by the same judge presiding over the termination proceeding could be a form of judicial influence that is no less proscribed than judicial testimony, much like a judicial comment on the weight of the evidence. *In the Interest of M.S.*, 115 S.W.3d 534, 538 (Tex. 2003).

In this case, the trial court's pre-trial order contained numerous findings, including a finding that S.J.T.B. was in immediate danger in his parents' home. Assuming, without deciding, the trial court abused its discretion by admitting the order into evidence, the parents fail to demonstrate how admission of the order caused harm. The record does not indicate that the Department relied on or emphasized the trial court's previous findings. Additionally, the record contains sufficient evidence from which the jury could find endangerment by the parents to support its termination findings. We cannot say that, but for admission of the trial court's pre-trial order, the jury would have reached a different

---

[4]The parents contend the trial court made other comments on the weight of the evidence, but the record does not indicate that the parents objected at trial. *See* Tex. R. App. P. 33.1(a).

23

conclusion. *See M.S.*, 115 S.W.3d at 542. Any error in admission of the order was harmless. We overrule the parents' first issue.

## Ineffective Assistance

In issue three, the parents contend that they received ineffective assistance of counsel at trial. To establish ineffective assistance, a client must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the client, such that the client was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The client must show that counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 688, 694. Our review of counsel's performance is highly deferential, and we presume that counsel's conduct falls within the range of reasonable professional assistance, including that of strategy or professional opinion. *Id*. at 689; *M.S.*, 115 S.W.3d at 549. We consider all circumstances surrounding the case and primarily focus on whether counsel performed in a "reasonably effective" manner. *M.S.*, 115 S.W.3d at 545.

Leslie contends that he received ineffective assistance of counsel because his trial counsel sought and obtained a motion in limine regarding allegations of sexual abuse by Leslie, but failed to object when such evidence was admitted at trial and offered no evidence in rebuttal. Daniealle complains that her trial counsel failed to file a motion in

24

limine regarding evidence of her drug use, mental illness, and instability preceding S.J.T.B.'s birth, failed to object when such evidence was admitted at trial, and failed to offer rebuttal evidence.

The record is silent regarding the reasons or strategies behind the actions of the parents' trial attorneys. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions."). Moreover, the parents cannot demonstrate that, but for the alleged errors by their counsel, the result of the termination proceeding would have been different. *See Strickland*, 466 U.S. at 694. Even without the evidence of which Leslie and Daniealle complain, the record contains other evidence of endangerment to support the jury's verdict against them. *See In the Interest of B.L.D.*, 113 S.W.3d 340, 347 (Tex. 2003) (Allegations of endangerment permit termination based on each parent's knowing exposure of the child to one another's endangering conduct.); *M.R.J.M.*, 280 S.W.3d at 502 (Inappropriate or abusive conduct by a person with whom a child is compelled to associate on a regular basis in his home is a part of the child's conditions or surroundings.); *J.T.G.*, 121 S.W.3d at 125; *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997), *overruled on other grounds, J.F.C.,* 96 S.W.3d at 267 n.39 (One parent's drug-related endangerment of the

child may be imputed to the other parent.). Under these circumstances, the parents are unable to satisfy both *Strickland* prongs; therefore, we overrule their third issue.

Having overruled the parents' three appellate issues and petitioners' four appellate issues, we affirm the trial court's judgment.

AFFIRMED.

                                       _____

                                           STEVE McKEITHEN
                                              Chief Justice

Submitted on September 25, 2012
Opinion Delivered November 15, 2012
Before McKeithen, C.J., Gaultney and Kreger, JJ.